In the

# United States Court of Appeals

## for the Seventh Circuit

———————————

No. 20-1570

RUFUS WEST,

*Plaintiff-Appellant,*

*v.*

DYLON RADTKE, Warden,* et al.,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 17-cv-482-pp — **Pamela Pepper**, *Chief Judge.*

———————————

ARGUED SEPTEMBER 22, 2021 — DECIDED SEPTEMBER 16, 2022

———————————

Before SYKES, *Chief Judge*, and FLAUM and BRENNAN,
*Circuit Judges*.

SYKES, *Chief Judge*. Rufus West is confined at Wisconsin's
Green Bay Correctional Institution where he must undergo
strip searches by prison staff on regular occasions—namely,

———————————

* We substitute Dylon Radtke for Scott Eckstein in his official capacity as
Warden of the Green Bay Correctional Institution. *See* FED. R. APP.
P. 43(c). Eckstein remains a defendant on the individual-capacity claim.

when he leaves and reenters the prison, during lockdowns, before and after visits from outsiders and certain other movements within the facility, and whenever directed by a prison supervisor. Under prison policy two guards participate in every strip search, one who directly performs it and another who observes to ensure that it is performed properly.

West is a Muslim. Strip searches by prison guards of the opposite sex violate the moral tenets of his faith, which prohibit him from exposing his body to a woman who is not his wife. In July 2016 he was required to submit to a strip search by a guard who is a transgender man—a woman who identifies as a man. West objected on religious grounds but was refused an accommodation, and the transgender guard participated in the strip search as the observing officer. After this incident, West requested an exemption from future cross-sex strip searches. The warden denied the request and told West that he would be disciplined if he objects again.

West responded with this lawsuit against the warden and various corrections officials. He chiefly seeks an injunction against cross-sex strip searches under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc *et seq.*, which prohibits a prison from substantially burdening an inmate's religious exercise unless doing so is the least restrictive means to further a compelling governmental interest. Separately, he asserts a violation of his Fourth Amendment right to be free from unreasonable searches.

The district court dismissed the constitutional claim based on circuit precedent holding that a prisoner has no Fourth Amendment interest against visual inspections of his

body. West asks us to reverse this ruling based on *Henry v. Hulett*, 969 F.3d 769 (7th Cir. 2020) (en banc), which overruled that precedent.

The RLUIPA claim failed on cross-motions for summary judgment. The judge concluded that West had not shown a substantial burden on his religious exercise because he was subjected to only one cross-sex strip search and it's not clear when others will occur. The judge also determined that cross-sex strip searches are permissible in any event as the prison's only means to avoid unlawfully discriminating against its transgender employees.

We reverse. *Henry* revives the Fourth Amendment claim. And West is entitled to judgment in his favor on the RLUIPA claim. There's no dispute that his objection to cross-sex strip searches is both religious in nature and sincere. The prison has substantially burdened his religious exercise by requiring him to either submit to cross-sex strip searches in violation of his faith or face discipline. The burden is unjustified under RLUIPA's strict-scrutiny standard: accommodating West's request for an exemption from cross-sex strip searches will not violate the antidiscrimination rights of transgender prison employees under Title VII of the Civil Rights Act of 1964 or the Equal Protection Clause of the Fourteenth Amendment. Accordingly, we remand for entry of appropriate injunctive relief on the RLUIPA claim and further proceedings on the Fourth Amendment claim.

## I. Background

West is serving a lengthy prison term imposed by a Wisconsin court and is confined in the state prison in Green Bay. According to his Islamic beliefs, he is forbidden to

expose his naked body to anyone but his wife. This precept compels him to shield the area between his naval and knees from others, especially from those of the opposite sex. Knowingly violating the nudity prohibition will condemn him in the afterlife, with greater condemnation resulting from cross-sex violations of the taboo.

As a prisoner West is occasionally subjected to strip searches of his naked body. He submits to these searches because he understands their role in prison administration and because Islam compels him to avoid unnecessary conflict. But he draws a line between strip searches conducted by male guards and those conducted by female guards. Exposing his naked body to a woman who is not his wife is the more serious violation of his faith, so he objects on religious grounds to being strip-searched by female prison employees.

The Green Bay Correctional Institution, like other state prisons, conducts inmate strip searches pursuant to policies promulgated by the Wisconsin Department of Corrections. The Department defines a strip search as "the examination of [an] inmate's clothing and body and a visual inspection of his or her body, so as to permit a visual inspection of the person's breasts, buttocks or genitalia." Wis. Div. of Adult Insts. Policy # 306.17.02 p.2 (Mar. 26, 2015). Strip searches are conducted in several circumstances, including when an inmate leaves or enters the prison, before certain movements within the prison, before and after visits with those outside the prison, during periodic lockdowns, or at any time as directed by a prison supervisor. *Id.* # 306.17.02(III)(D).

The policy explains how strip searches are conducted. Two staff members are required: one prison guard "directly

observ[es]" the inmate being searched while a second guard "observes the first [guard]" to ensure that the search is properly conducted. *Id.* # 306.17.02(III)(E). Both guards "shall be in close proximity to the inmate." *Id.* # 306.17.02(III)(E)(b).

The policy specifically prohibits "cross gender" strip searches "except in exigent circumstances." *Id.* # 306.17.02(III)(A). This rule follows a regulation promulgated by the federal Department of Justice pursuant to the Prison Rape Elimination Act of 2003 ("PREA"), 34 U.S.C. §§ 30301 *et seq.*, under which "cross-gender" strip searches are prohibited "except in exigent circumstances or when performed by medical practitioners." 28 C.F.R. § 115.15(a). The term "gender" is not specifically defined; neither the prison policy nor the federal regulation specifies whether the term is synonymous with "sex"—that is, biologically male or female. *See, e.g.*, *Sex*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("The sum of the peculiarities of structure and function that distinguish a male from a female organism; gender."); *Gender*, GARNER'S MODERN ENGLISH USAGE (4th ed. 2016) (describing the interchangeability of and possible distinctions between "sex" and "gender").

Nor does the DOJ's guidance provide a definition. The guidance is vague and suggests only that a transgender guard's "gender" for purposes of PREA should be determined with reference to applicable legal authorities. Absent such authorities, the DOJ recommends that the guard's gender should be an "individualized determination" made "not solely on the basis of the [guard's] biological gender." *Frequently asked questions*, NATIONAL PREA RESOURCE CENTER

(Apr. 23, 2014), https://www.prearesourcecenter.org/node/3261.

The incident sparking this lawsuit occurred in July 2016. West was visited by a friend from outside the prison, and after the visit he was approached by Corrections Officer Isaac Buhle for a routine postvisit strip search. Buhle, who began working at the prison six months earlier, is a transgender man—a woman who identifies as a man—and was assigned the duties of a male guard.

West objected on religious grounds to being strip-searched by Buhle. He asked if other nearby guards, all biological males, could instead perform the search. One agreed to do so, but Buhle still participated in the search in the role of the observing officer. West says that Buhle saw him naked from the observation position. Prison officials respond that the setup of the room where the search occurred should have prevented this. As they describe the room, an inmate to be strip-searched enters one of several three-sided stalls, each equipped with a "courtesy curtain" to provide privacy from those not participating in the search; the guard directly performing the search stands at the opening while the guard in the observation role stands at an angle to the opening. Still, West's claim that his body was exposed to Buhle during the search remains uncontradicted. He is the only person who recalls the search. Buhle has no recollection of the incident.

After the strip search, West filed a complaint with prison officials and requested an exemption from cross-sex strip searches. The warden denied the request in writing, stating: "[T]he officer in question is a male and is qualified to complete these duties. If in the future you are directed to submit

to a strip search by this individual or any other male staff member[,] it is my expectation that you will comply." The security director responded separately, writing: "[T]his person is a male[,] and any further issues on this will result in discipline for you." West then filed a complaint with the Department of Corrections, but this request, and his subsequent appeal, were denied.

West then filed suit against the warden, the security director, Buhle, and several other prison officials; we refer to the defendants collectively as "the prison." His pro se complaint raised several claims, just two of which remain relevant on appeal: a Fourth Amendment claim under 42 U.S.C. § 1983 and a RLUIPA claim seeking an injunction exempting him from cross-sex strip searches.

The district judge screened the complaint as required by the Prison Litigation Reform Act. *See* 28 U.S.C. § 1915A. She dismissed the constitutional claim based on circuit precedent holding that a prisoner has no Fourth Amendment privacy interest against visual inspections of his body. That precedent has since been overruled by our decision in *Henry*. The same screening order also rejected a request from West for the appointment of pro bono counsel.

The parties filed cross-motions for summary judgment on the RLUIPA claim. As noted, RLUIPA bars prisons from substantially burdening an inmate's religious exercise unless doing so is the least restrictive means to further a compelling governmental interest. The prison argued that its strip-search policy—which so far had resulted in only one cross-sex strip search of West—had not substantially burdened his religious exercise. The prison argued in the alternative that the policy was lawful in any event as a necessary means to

further several compelling interests, including complying with the antidiscrimination requirements of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and the Equal Protection Clause of the Fourteenth Amendment.[1]

The judge granted the prison's motion and denied West's, ruling that the prison had not substantially burdened West's religious exercise. She emphasized that West identified only one cross-sex strip search and that future cross-sex strip searches were not likely to consistently recur. She also doubted that West could be burdened by strip searches conducted by transgender men given that he does not seek an exemption from strip searches generally.

The judge went on to address the prison's asserted interests in complying with antidiscrimination law. Although West requested an accommodation based on the sex of the guard performing the search, the judge reasoned that the relevant trait for the analysis is transgender status. Using this lens, she rejected the prison's Title VII argument because transgender status is not included in the statute's list of protected classes. She accepted the equal-protection justification, however, based on caselaw in which transgender plaintiffs had asserted colorable equal-protection claims.

Final judgment for the prison followed. West appealed, still proceeding pro se. After reviewing the initial briefs, we

---

[1] In the district court, the prison also asserted interests in effective prison management and the medical privacy of its staff. It no longer relies on those interests.

recruited pro bono counsel for him, ordered new briefing, and held oral argument.[2]

## II. Discussion

We turn first to West's RLUIPA claim and then address his Fourth Amendment privacy claim, which we consider in light of intervening circuit precedent.

### A.  The RLUIPA Claim

We begin with some background regarding RLUIPA. The statute is the product of a long-running congressional effort to limit governmental action that burdens the free exercise of religion. The legislative initiative began in response to *Employment Division, Department of Human Resources v. Smith*, 494 U.S. 872 (1990). There the Supreme Court held that the Free Exercise Clause of the First Amendment does not exempt religious exercise from neutral rules of general applicability. *Id.* at 879. *Smith* thus left religious practice vulnerable to laws that incidentally burden the right to the free exercise of religion. That was a departure from *Wisconsin v. Yoder*, 406 U.S. 205 (1972), and *Sherbert v. Verner*, 374 U.S. 398 (1963), older cases that applied strict scrutiny to laws that incidentally burden religious exercise.

Congress first responded to *Smith* with the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. §§ 2000bb *et seq.* RFRA provides that a government may not substantially burden a person's religious exercise unless

---

[2] Nicholas Gowen and Geneva Ramirez of the firm Burke, Warren, MacKay & Serritella, P.C., accepted the pro bono appointment. They have ably discharged their duties. We thank them for their service to the court and their client.

doing so is the least restrictive means to further a compelling governmental interest. *Id.* § 2000bb-1(b). RFRA's protections expressly apply to laws of "general applicability," *id.* § 2000bb-1(a), reflecting Congress's judgment that "laws 'neutral' toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise," *id.* § 2000bb(a)(2). The goal, in short, was to restore through statute the "compelling interest test" adopted in *Yoder* and *Sherbert* for free-exercise claims. *Id.* § 2000bb(b)(1).

The story doesn't end with RFRA. As originally enacted the statute reached all laws, regulations, and governmental actions—both state and federal. But the Supreme Court curtailed RFRA's reach in *City of Boerne v. Flores*, 521 U.S. 507, 529–32 (1997), which held that the statute's application to the states exceeded Congress's Fourteenth Amendment enforcement power. This again left religious exercise vulnerable to state action under the *Smith* rule.

Congress responded again, this time with RLUIPA. The statute invokes Congress's powers under the Spending and Commerce Clauses to partially patch the hole left by *City of Boerne*. *See* 42 U.S.C. § 2000cc-1(b). Relevant here, RLUIPA provides that a federally funded prison may not "impose a substantial burden on the religious exercise" of an inmate unless it can prove that doing so "is the least restrictive means of furthering [a] compelling governmental interest." *Id.* § 2000cc-1(a). This is not a new standard but rather a second attempt to install the protections set out in RFRA's codification of the strict-scrutiny standard of *Yoder* and *Sherbert*. *Koger v. Bryan*, 523 F.3d 789, 802 (7th Cir. 2008). A prisoner whose religious exercise has been burdened in

violation of the statute may sue for injunctive or declaratory relief. *Charles v. Verhagen*, 348 F.3d 601, 606 (7th Cir. 2003).

RLUIPA thus generously protects the religious exercise of those confined in penal institutions. The term "religious exercise" is amply defined as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). To comply with RLUIPA, a prison may be required to provide individual exemptions to general rules, *id.* § 2000cc-3(e), and may also need to "incur expenses in its own operations to avoid imposing a substantial burden on religious exercise," *id.* § 2000cc-3(c). Congress further instructed that RLUIPA "shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." *Id.* § 2000cc-3(g).

A plaintiff raising a RLUIPA claim bears the initial burden to make a prima facie case that a prison practice substantially burdens his sincere religious exercise. *Holt v. Hobbs*, 574 U.S. 352, 360–61 (2015) (citing *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 717 n.28 (2014)). If he can make this showing, the burden shifts to the defendant to prove that the practice in question is the least restrictive means to further a compelling governmental interest. *Ramirez v. Collier*, 142 S. Ct. 1264, 1277 (2022).

West lost in the district court at each step in this framework. The judge first determined that he had not made a prima facie case that his religious exercise was substantially burdened and then held that the prison satisfied the compelling-interest test in any event. She therefore granted the prison's motion for summary judgment and denied

West's. We review that ruling de novo. *Markel Ins. Co. v. Rau*, 954 F.3d 1012, 1016 (7th Cir. 2020).

### 1. *Substantial Burden*

As we've noted, a plaintiff raising a RLUIPA claim must first show that the challenged prison practice substantially burdens his religious exercise and that his request for a religious exemption is sincere. *See Ramirez*, 142 S. Ct. at 1277–78; *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 428 (2006). The challenged practice here is the prison's policy requiring West to submit to cross-sex strip searches in violation of the moral tenets of his Islamic faith. Everyone agrees that West's objection to this practice is both religious in nature and sincere. The dispute at this step of the RLUIPA framework centers on whether the prison's strip-search policy is a substantial burden on West's religious exercise.

We are guided by the Supreme Court's decisions in *Hobby Lobby* and *Holt*, both of which addressed what constitutes a substantial burden on religious exercise. In *Hobby Lobby* employers sued the Secretary of Health and Human Services under RFRA seeking an exemption from a federal law requiring them to provide health-insurance coverage for contraceptives in violation of their religious beliefs. 573 U.S. at 701. Refusing to provide the coverage brought hefty fines of potentially millions of dollars. *Id.* at 720. The Court held that forcing the employers to choose between considerable financial penalties and providing the coverage in violation of their religious beliefs was a substantial burden on their religious exercise. *See id.*

*Holt* considered the substantial-burden standard in the context of a RLUIPA claim by a prisoner. A Muslim inmate sought an exemption from a prison policy banning facial hair so he could wear a half-inch beard in accordance with his religious beliefs, which prohibited him from trimming his beard. *Holt*, 574 U.S. at 358–59. Prison officials denied the request, telling him that violating the policy would result in discipline. *Id.* at 359. The Court held that requiring the inmate, on pain of discipline, to shave his beard in violation of his religious obligations substantially burdened his religious exercise. *Id.* at 361.

The pertinent lesson from *Holt* and *Hobby Lobby* is that a substantial burden on religious exercise occurs when a prison attaches some meaningful negative consequence to an inmate's religious exercise, forcing him to choose between violating his religion and incurring that negative consequence. *See Jones v. Carter*, 915 F.3d 1147, 1150 (7th Cir. 2019). Or as we have previously stated, "a burden on religious exercise … arises when the government 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Korte v. Sebelius*, 735 F.3d 654, 682 (7th Cir. 2013) (alteration in original) (quoting *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 718 (1981)). In assessing whether a burden is substantial, we "focus[] primarily on the intensity of the coercion applied by the government" and not the centrality of the religious practice in question.[3] *Id.* at 683 (cleaned up).

---

[3] We do not mean to suggest that a substantial burden may arise only when a prison threatens an inmate with some negative consequence. A substantial burden might also arise when a prison declines to provide an inmate access to something that will allow him to exercise his religion.

Neither *Holt* nor *Hobby Lobby* suggested that the burdens identified in those cases set "floor[s]" for establishing a substantial burden on religious exercise. *Jones*, 915 F.3d at 1150. Although the relevant line—how much pressure is too much—may be difficult to discern with precision, we know from *Holt* that "significant disciplinary consequences" cross it. *Id.* It's clear, then, that the prison has put West to a choice that RLUIPA aims to avoid. Prison officials told him, unequivocally, that he must submit to future strip searches by Buhle (and presumably any other prison employee who is a transgender man) and that refusal will result in discipline. That's a substantial burden as the Supreme Court has interpreted the statutory standard. And while the disciplinary threats themselves cross the relevant line, we add that West might additionally feel pressure to forgo activities—such as visits with family or friends—to decrease his chances of enduring a cross-sex strip search.

The prison counters that Buhle might not have seen West naked during the first search, but that contention is immaterial to resolving the substantial-burden question. West seeks prospective relief from the prison's policy requiring him to submit to future cross-sex strip searches.

The prison also emphasizes that West has been approached for only one cross-sex strip search in more than two decades of imprisonment and cannot say when the next one will occur. The argument, in other words, is that cross-

---

*See, e.g., Schlemm v. Wall*, 784 F.3d 362, 365 (7th Cir. 2015) (considering whether a prison's refusal to provide traditional foods for a religious feast amounted to a substantial burden on religious exercise).

sex strip searches do not occur frequently enough to sub-stantially burden his religious exercise.

One problem with this argument is that it gets the rele-vant timeframe wrong. West was subjected to a cross-sex strip search just six months after the prison hired Buhle. And it's worth noting that the prison does not argue that West lacks an actual or imminent injury to support his standing to seek injunctive relief. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983). (To be clear, we have no independent concerns about his standing.)

The more fundamental problem with the prison's argu-ment is that a substantial burden can exist even if it is uncer-tain when a prisoner will next be put to the choice of violating his religious beliefs or facing discipline. As we've explained, the prison regularly strip-searches inmates, and it has told West in no uncertain terms that he must submit to future strip searches conducted by Buhle. The prison's policy requiring West to submit to cross-sex strip searches and its stated intention to enforce that policy with disciplinary measures stands as a present and substantial burden on West's religious exercise.

The prison also suggests that the burden is illusory be-cause West can simply ask a guard who is about to strip-search him for an on-the-spot exemption from a cross-sex strip search. But West's request for an accommodation has already been denied multiple times—first when Buhle participated in the July 2016 strip search and several more times when the prison denied his exemption request through the inmate complaint process. There is no ambigu-ty here. Prison officials have warned West that he will be disciplined for refusing to comply with any future cross-sex

strip searches. That standing threat of punishment is a substantial burden on his religious exercise. West is not required to leave his RLUIPA religious-exercise rights to the graces of individual prison employees who may or may not be willing to violate prison policy by granting an on-the-spot exemption.

Finally, the prison argues that West's limited request for an exemption from *only* cross-sex strip searches undermines his claim because *all* strip searches—even those by male guards—violate the nudity taboo of his religion. To the extent this is an objection to West's willingness to compromise, the argument fails under Supreme Court and circuit precedent. In *Holt* the prisoner proposed a half-inch beard even though his faith obligations forbade him from trimming his beard at all. 574 U.S. at 359. The Court nonetheless found a substantial burden on his religious exercise. *Id.* at 361. In *Schlemm v. Wall*, 784 F.3d 362, 363 (7th Cir. 2015), a prisoner sought game meat for a religious feast but was willing to settle for ground beef. That proposal did "not scuttle his claim, any more than Holt's proposed compromise (a short beard) did." *Id.* at 365.

At times the prison's argument goes beyond objecting to compromise and begins to imply that West misunderstands what his religion requires. The prison suggests that we can infer that West is not *really* burdened by cross-sex strip searches because prison life demands that he endure strip searches generally. Put slightly differently, the prison maintains that West shouldn't care who strip-searches him because the religious transgression is equally grave whether his naked body is exposed to a male or a female guard.

As an evidentiary matter, this argument is contrary to the record. At his deposition West explained that although the nudity prohibition applies generally, he "would be punished more harshly if … Officer Buhle strip search[ed] [him] than if … a man strip search[ed] [him]."

The argument also misses the mark as a matter of law. The substantial-burden inquiry does not ask whether West's understanding of his faith obligations is correct. "Courts are not arbiters of scriptural interpretation," *Thomas*, 450 U.S. at 716, so "the test for substantial burden does not ask whether the claimant has correctly interpreted his religious obligations," *Korte*, 735 F.3d at 683. West's understanding of the Islamic faith draws the line at cross-sex strip searches, and "it is not for us to say that the line he drew was an unreasonable one." *Thomas*, 450 U.S. at 715; *see, e.g., United States v. Lee*, 455 U.S. 252, 257 (1982) (refusing to entertain the argument that "payment of social security taxes will not threaten the integrity of the Amish religious belief or observance").

To be clear, courts are authorized to decide—indeed, must decide—whether a request for a faith-based exemption is in fact religious in nature and sincere. *See Koger*, 523 F.3d at 797–98; *see also Ramirez*, 142 S. Ct. at 1277–78; *Lee*, 455 U.S. at 257. These are "factual inquiries within the court's authority and competence" that are "important to weed out sham claims." *Korte*, 735 F.3d at 683; *see also Hobby Lobby*, 573 U.S. at 718 ("[T]he scope of RLUIPA shows that Congress was confident of the ability of the federal courts to weed out insincere claims."). But there's no dispute about the religiosity or sincerity of West's beliefs. The prison's argument on the substantial-burden question is both factually and legally flawed.

Requiring West to submit to cross-sex strip searches substantially burdens his religious exercise by forcing him to either violate his religious duties or be disciplined. The burden thus shifts to the prison, which must justify its policy under RLUIPA's strict-scrutiny test.

### 2. *Compelling Interest; Least Restrictive Means*

A substantial burden on an inmate's religious exercise is justified under RLUIPA only if the prison can show that it "is the least restrictive means of furthering [a] compelling governmental interest." § 2000cc-1(a)(2). RLUIPA's strict-scrutiny standard, like others, is "exceptionally demanding." *Hobby Lobby*, 573 U.S. at 728. "[I]f a less restrictive means is available for the [g]overnment to achieve its goals, the [g]overnment must use it." *Holt*, 574 U.S. at 365 (first alteration in original) (quotation marks omitted). In applying the test, courts cannot show "unquestioning deference" to prison officials, *id.* at 364, but must themselves "consider whether exceptions are required under the test set forth by Congress," *id.* (quoting *O Centro Espírita*, 546 U.S. at 434).

Critical to the proper application of the compelling-interest test is viewing the asserted governmental interest at the correct level of generality. The test is tailored "to the person" seeking relief. *Id.* at 363 (quoting *Hobby Lobby*, 573 U.S. at 726). We must therefore "look beyond 'broadly formulated interests justifying the general applicability of government mandates' and 'scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants.'" *Korte*, 735 F.3d at 685 (alteration in original) (quoting *O Centro Espírita*, 546 U.S. at 431); *see also Holt*, 574 U.S. at 363. "Put simply, we must examine both sides of the ledger on the same case-specific level of generality: asking whether

the government's particular interest in burdening this plaintiff's particular religious exercise is justified in light of the record in this case." *Yellowbear v. Lampert*, 741 F.3d 48, 57 (10th Cir. 2014).

If a prison cannot satisfy the compelling-interest test, it may need to "change [its] rules to accommodate [a] religious practice[]" of a particular prisoner. *Schlemm*, 784 F.3d at 365. *Holt* illustrates how this requirement applies in practice. There prison officials argued that forbidding the prisoner from growing a half-inch beard was necessary to detect hidden contraband. *Holt*, 574 U.S. at 364. The Court acknowledged the expertise of prison officials on matters of institutional security, but the prison's rationale still could not survive the level of scrutiny that RLUIPA requires. *Id.* Even if a half-inch beard could conceal contraband—a point the Court doubted—the prison already searched inmates' hair and clothing for contraband, and it gave no reason why it couldn't do the same for a short beard. *Id.* at 364–65.

Although the burden RLUIPA places on prisons is demanding, applying the compelling-interest test must account for the distinctive needs of penal institutions. As the Supreme Court has explained, "[c]ontext matters" in applying the strict-scrutiny standard. *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005) (alteration in original) (quoting *Grutter v. Bollinger*, 539 U.S. 306, 327 (2003)). Thus, "courts should not blind themselves to the fact that the analysis is conducted in the prison setting." *Holt*, 574 U.S. at 369; *see also Cutter*, 544 U.S. at 722 ("We do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety.").

Here the prison offers two justifications for its cross-sex strip-search policy, both rooted in antidiscrimination law. It argues that granting an accommodation for West will violate the equal-employment rights of its transgender employees under Title VII and the Equal Protection Clause.

### (i) Title VII

Everyone agrees that complying with Title VII is a compelling governmental interest. We therefore narrow our focus and ask whether denying West an exemption is the least restrictive means to further this interest.

Title VII makes it unlawful to discriminate in "terms, conditions, or privileges of employment" against an individual because of his "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff bringing a disparate-treatment claim under Title VII must show that he belongs to a protected class and that he has suffered an adverse employment action due to his membership in that class. *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 779 (7th Cir. 2007). The prison bears the burden of establishing that accommodating West would entail violating the Title VII rights of its transgender employees.

In the district court, the prison suggested that this case is about transgender-status discrimination. The judge thought so too and cut short the Title VII inquiry because transgender status is not listed as a protected class in the statute. That was before *Bostock v. Clayton County*, 140 S. Ct. 1731, 1741 (2020), which held that transgender-status discrimination amounts to sex-based discrimination for Title VII purposes.

The prison also must show, however, that granting West's request for an exemption from cross-sex strip searches would amount to an adverse employment action against its transgender employees. *Lewis v. City of Chicago*, 496 F.3d 645, 652–53 (7th Cir. 2007). Adverse employment actions are "material, sufficiently important alterations of the employment relationship." *Id.* at 654 (quotation marks omitted). This means "something more disruptive than a mere inconvenience or an alteration of job responsibilities." *Nichols*, 510 F.3d at 780 (quotation marks omitted).

Broadly speaking, three types of employment actions meet the threshold:

> (1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge.

*Barton v. Zimmer, Inc.*, 662 F.3d 448, 453–54 (7th Cir. 2011). The last category includes severe and pervasive harassment: "mistreatment of an employee by coworkers or supervisors that is sufficiently severe to worsen substantially his conditions of employment as they would be perceived by a reasonable person in the position of the employee." *Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 745 (7th Cir. 2002).

The prison offers no argument under established Title VII doctrine that exempting West from cross-sex strip searches would inflict an adverse employment action on its

transgender employees. There's no suggestion that a change in compensation would result, and such an insignificant change in job duties neither harms the career prospects of transgender employees nor creates a hostile work environment. And it certainly does not amount to a constructive discharge. Simply put, requiring strip searches to be performed by guards of the same sex as the inmate does not materially alter the conditions of employment. The prison does not argue otherwise.

The prison's Title VII argument would fail even if it could show that exempting West from cross-sex strip searches would lead to an adverse employment action. Title VII permits sex-based distinctions in employment where sex "is a bona fide occupational qualification reasonably necessary to the normal operation of [a] particular business or enterprise." 42 U.S.C. § 2000e-2(e).

Generally speaking, the exception is narrow and approves sex-based employment discrimination only where "the essence of the business operation would be undermined by not hiring members of one sex exclusively." *Torres v. Wis. Dep't of Health & Soc. Servs.*, 859 F.2d 1523, 1527 (7th Cir. 1988) (en banc) (quoting *Dothard v. Rawlinson*, 433 U.S. 321, 333 (1977)). The distinctive needs of prisons, however, often allow sex-based adjustments to employment duties. *See, e.g.*, *Dothard*, 433 U.S. at 335–36 (order and security in a prison housing particularly violent inmates, including many sex offenders); *Everson v. Mich. Dep't of Corr.*, 391 F.3d 737, 753 (6th Cir. 2004) (prison security and inmate safety and privacy); *see also Reidt v. County of Trempealeau*, 975 F.2d 1336, 1339 n.3 (7th Cir. 1992) ("Title VII's proscription against sexual

discrimination in employment must be balanced against issues of inmate privacy and jail security … .").

Sex is a bona fide occupational qualification for performing strip searches of prisoners with sincere religious objections to cross-sex strip searches. RLUIPA requires a prison to avoid placing a substantial burden on an inmate's religious exercise as long as it can do so without undermining a compelling governmental interest. Here the asserted governmental interest—complying with Title VII—expressly allows sex-based limitations on strip-search duty because the limitation is reasonably necessary to accommodate the bodily-privacy and religious-exercise rights of inmates.

Courts have long recognized that sex is a trait relevant to inmate privacy. "[W]hile all forced observations or inspections of the naked body implicate a privacy concern, it is generally considered a greater invasion to have one's naked body viewed by a member of the opposite sex." *Harris v. Miller*, 818 F.3d 49, 59 (2d Cir. 2016) (alteration in original) (quoting *Canedy v. Boardman*, 16 F.3d 183, 185 (7th Cir. 1994)); *see also Byrd v. Maricopa Cnty. Sheriff's Dep't*, 629 F.3d 1135, 1141 (9th Cir. 2011) ("The desire to shield one's unclothed figure from [the] view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity." (alteration in original) (quoting *York v. Story*, 324 F.2d 450, 455 (9th Cir. 1963))). That "basic fact of human behavior" sometimes allows or even requires sex-based adjustments to prison guard duties. *Smith v. Fairman*, 678 F.2d 52, 53 (7th Cir. 1982) (per curiam).

Federal law and the prison's own policy acknowledge the relevance of sex to prison strip searches. The prison already bans "cross-gender" strip searches in accordance with

PREA. *See* 28 C.F.R. § 115.15(a). Even so, the prison insists that denying West's requested accommodation is consistent with these rules. It argues that "gender," which is left undefined in the applicable prison policy and federal regulation and guidance, means something other than biological sex.

There are reasons to doubt the prison's interpretation of these authorities.[4] That aside, we have previously explained that Title VII allows prisons to prohibit cross-sex strip searches for purposes of inmate privacy. In *Canedy v. Boardman*, a male inmate asserted a constitutional-privacy claim against a host of cross-sex privacy intrusions by female guards, ranging from being observed while dressing and showering to being strip-searched. 16 F.3d 183, 184 (7th Cir. 1994). The defendant prison officials responded that the inmate's privacy interests were outweighed by the prison's interest in providing equal-employment opportunities to female guards. *Id.*

We began by acknowledging that inmates have significantly diminished privacy interests by virtue of their incarceration. *See id.* at 185. We also explained that sex is not, as a

---

[4] A Department of Corrections regulation provides that "[e]xcept in emergencies, a person of the same *sex* as the inmate being searched shall conduct [a] strip search." WIS. ADMIN. CODE DOC § 306.17(2)(b) (June 2018) (emphasis added). The undefined term "sex" presumably takes its ordinary meaning that refers to male and female biological traits. The prison's written policy instructs that strip searches "shall be conducted in compliance with" this state regulation. Wis. Div. of Adult Insts. Policy # 306.17.02(I)(A) (Mar. 26, 2015). And as explained, the DOJ suggests that "gender" as used in 28 C.F.R. § 115.15(a) should be interpreted with reference to applicable legal authorities such as the state regulation. West does not raise this point, however, and our conclusions do not rest on an interpretation of prison policy or state or federal regulations.

general matter, a bona fide occupational qualification for employment in all-male prisons; thus, "prisons must be allowed to utilize female guards to the fullest extent possible." *Id.* at 186–87 (quotation marks omitted). At the same time, however, inmates retain some "constitutional protection against invasion of their privacy by members of the opposite sex." *Id.* at 186 (quotation marks omitted).

To reconcile the conflicting interests of inmate privacy, prison security, and employment rights, we applied the Fourth Amendment's requirement that all "searches must be conducted in a reasonable manner." *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 560 (1979)). Applying the reasonableness test, we held that "occasional or inadvertent sighting[s] by female prison employees" do not violate a male inmate's privacy interests and hence require no accommodation. *Id.* at 187. We also held, however, that more intrusive cross-sex privacy invasions—"like a strip search, in the absence of an emergency"—are materially different. *Id.* These particularly invasive cross-sex viewings require a reasonable accommodation. *Id.* at 188.

*Canedy* demonstrates that Title VII does not require a prison to permit cross-sex strip searches. The prison resists this conclusion, arguing that *Canedy* is distinguishable because it presented a clash between an inmate's constitutional rights and the statutory rights of female prison employees while here West's claim is grounded in rights conferred by statute. That distinction is immaterial. The pertinent point from *Canedy*—no matter the source of the right invoked there—is that it provides the prison with a full defense to a charge that exempting West from cross-sex strip searches violates Title VII.

The prison also contends that *Canedy* does not apply because it concerned a male prisoner and female prison guards while this case concerns a male prisoner and a prison guard who is a transgender man. But a prisoner's right to be free from highly invasive intrusions on bodily privacy by prison employees of the opposite sex—whether on religious or privacy grounds—does not change based on a guard's transgender status.

For all these reasons, the prison can accommodate West's request for a religious exemption from cross-sex strip searches without violating Title VII. We turn next to the prison's additional (but overlapping) justification for denying the requested accommodation.

### (ii) Equal Protection Clause

The Equal Protection Clause of the Fourteenth Amendment commands that "[n]o State shall … deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. As the Supreme Court has explained, the clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). The prison contends that accommodating West's request for an exemption from cross-sex strip searches would violate the equal-protection rights of its transgender male employees.

The first task in equal-protection analysis is to identify the type of governmental classification at issue, which determines the level of scrutiny that applies. *See id.* at 440–41. The district judge and the prison have wrongly treated the classification as one based on transgender status. We deal with a sex-based classification because West asks for a

strip-search accommodation overtly conditioned on the sex of the prison guards. *See Tagami v. City of Chicago*, 875 F.3d 375, 380 (7th Cir. 2017); *see also Pers. Adm'r v. Feeney*, 442 U.S. 256, 273 (1979).

When a sex-based classification is at issue, the burden is on the state to demonstrate that the "classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1050 (7th Cir. 2017) (quoting *United States v. Virginia*, 518 U.S. 515, 524 (1996)). "Between [the] extremes of rational basis review and strict scrutiny," *Clark v. Jeter*, 486 U.S. 456, 461 (1988), "[t]his intermediate level of judicial scrutiny recognizes that sex 'has never been rejected as an impermissible classification in all instances,'" *Tagami*, 875 F.3d at 380 (quoting *Rostker v. Goldberg*, 453 U.S. 57, 69 n.7 (1981)). Indeed, "[p]hysical differences between men and women … are enduring," *Virginia*, 518 U.S. at 533, and "a community made up exclusively of one [sex] is different from a community composed of both," *id.* (alteration in original) (quoting *Ballard v. United States*, 329 U.S. 187, 193 (1946)).

The prison's position is immediately in doubt given that *Canedy*, though not an equal-protection case, endorsed a ban on cross-sex strip searches. 16 F.3d at 187–88. *Canedy* aside, the prison has not developed an argument that exempting West from cross-sex strip searches would fail intermediate scrutiny if challenged on equal-protection grounds. The prison simply asserts that accommodating West would require it to treat its employees differentially based on sex.

That's obviously true, but the pertinent question is whether the difference in treatment is unlawful.

A sex-based classification of this type is not unlawful. Accommodating West's request for an exemption from cross-sex strip searches is substantially related to the important governmental objective of respecting the RLUIPA and constitutional-privacy rights of prison inmates. Indeed, the prison already prohibits female guards from strip-searching male prisoners except in exigent circumstances. If that is constitutionally permissible—and it is—so too is West's requested accommodation.

In sum, the prison will not violate any employee's Title VII or equal-protection rights by exempting West from cross-sex strips searches. On remand West is entitled to appropriate injunctive relief.

## B. Fourth Amendment Claim

Based on circuit precedent, the judge dismissed West's Fourth Amendment claim at screening for failure to state a claim. *See* 28 U.S.C. § 1915A(b)(1). That ruling followed from *King v. McCarty*, 781 F.3d 889, 900 (7th Cir. 2015), which held that a prisoner has no Fourth Amendment privacy interest against visual inspections of his body. After final judgment below, we overruled *King* while sitting en banc, holding in *Henry* that "the Fourth Amendment protects a right to bodily privacy for convicted prisoners, albeit in a significantly limited way, including during visual inspections." 969 F.3d at 774.

Fourth Amendment searches of prisoners, like all Fourth Amendment searches, are evaluated for reasonableness. *Kentucky v. King*, 563 U.S. 452, 459 (2011). To assess the

reasonableness of a search of a prisoner, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell*, 441 U.S. at 559. The inquiry, however, accounts for the "wide-ranging deference" owed to prison administrators in their adoption of practices to maintain order and security. *Henry*, 969 F.3d at 783 (quoting *Bell*, 441 U.S. at 547).

It is well established that strip searches of inmates performed for security purposes are reasonable as a general matter. *See Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 328–29 (2012); *Peckham v. Wis. Dep't of Corr.*, 141 F.3d 694, 696–97 (7th Cir. 1998). West's argument is limited to strip searches by prison employees of the opposite sex. (Contrary to the prison's assertion, he does not contend that the reasonableness of the searches turns on his religion.) As our earlier discussion explains, this claim finds support in circuit precedent holding that highly invasive cross-sex privacy intrusions like strip searches are unreasonable under certain circumstances (namely, absent exigent circumstances). *See Smith*, 678 F.2d at 53; *see also Canedy*, 16 F.3d at 186–87 (discussing the substantive-due-process right to privacy before applying the Fourth Amendment reasonableness test to cross-sex privacy intrusions in prisons). On the other hand, it is also clear that occasional and incidental cross-sex viewings do not invade a prisoner's Fourth Amendment privacy interests. *See Henry*, 969 F.3d at 783.

The precise contours of the Fourth Amendment claim need not be worked out on this appeal. It is enough to say that *Henry* has revived West's constitutional claim, and he is entitled to develop it on remand.

### III. Conclusion

For the foregoing reasons, we REVERSE the judgment and REMAND for the entry of appropriate injunctive relief on West's RLUIPA claim and further proceedings on his Fourth Amendment claim.